# THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | **CASE NO. 11-52027-RBK** |
| TAO-SAHI, LP, | § | |
| | § | **CHAPTER 11** |
| DEBTOR | § | |
| | § | |

## PROPOSED DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION

JACKSON WALKER L.L.P.
Marvin E. Sprouse III
Jack E. Skaggs
Kimberly Gdula
100 Congress Avenue, Suite 1100
Austin, Texas 78701
(512) 236-2000
(512) 236-2002 - Fax
Email: msprouse@jw.com
Email: jskaggs@jw.com
Email: kgdula@jw.com

COUNSEL FOR THE DEBTOR

**THE PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................1

    A.    General Information Concerning Disclosure Statement and Plan.........................1
    B.    Disclaimers. ....................................................................................................4

II. HISTORICAL BACKGROUND .................................................................................5

    A.    The Debtor's Business .....................................................................................5
    B.    The Debtor's Structure ....................................................................................7
    C.    Circumstances Leading to Bankruptcy .............................................................7
    D.    The Chapter 11 Case .......................................................................................8
    E.    The Debtor's Assets and Schedules..................................................................8
    F.    Post-Petition Operations..................................................................................9
    G.    Retention of Professionals..............................................................................10
    H.    Litigation Against SFG, the FDIC Entities, and S2 Acquisition.........................10

III. SUMMARY OF THE PLAN.....................................................................................12

IV. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS.............................................................................................................12

    A.    General Provisions and Classifications.............................................................12
    B.    Classification and Treatment of Claims and Equity Interests ............................14

V. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION
BY ONE OR MORE CLASSES OF IMPAIRED CLAIMS .........................................20

    A.    Classes Entitled to Vote .................................................................................20
    B.    Claim Class Acceptance Requirement ..............................................................20
    C.    Presumed Acceptance/Rejection of Plan...........................................................20
    D.    Non-consensual Confirmation .........................................................................20

VI. TREATMENT OF EXECUTORY CONTRACTS AND LEASES .....................................20

    A.    Assumption of Executory Contracts and Unexpired Leases ...............................20
    B.    Bar Date for Filing Cure Claims.......................................................................22

VII. PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN AND
TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED
CLAIMS ................................................................................................................23

    A.    Method of Distributions Under the Plan ...........................................................23
    B.    Objections to and Resolution of Disputed Administrative Claims and
            Disputed Claims ..................................................................................23

VIII. IMPLEMENTATION OF THE PLAN ......................................................................24

    A.     Implementing Actions ......................................................................24
    B.     Funding of Plan..............................................................................24
    C.     Vesting of Assets in the Reorganized Debtor...................................24
    D.     Filing of Tax Returns and Delivery of Data as to Debtor .................25
    E.     Costs and Expenses of the Reorganized Debtor ...............................25

IX. EFFECT OF CONFIRMATION ..............................................................26

    A.     Discharge of Debtor .......................................................................26
    B.     Exculpation and Release of Debtor and Professionals.......................26
    C.     Injunction Enjoining Holders of Claims Against the Debtor .............26

X. RETENTION OF EXCLUSIVE JURISDICTION BY THE BANKRUPTCY
    COURT ...................................................................................................27

    A.     Exclusive Jurisdiction of Bankruptcy Court....................................27
    B.     Condition Precedent to Effective Date..............................................28

XI. CONFIRMATION PROCEDURE..............................................................28

    A.     Solicitation of Votes.......................................................................28
    B.     Confirmation Hearing .....................................................................28
    C.     Acceptance .....................................................................................29
    D.     Fair and Equitable Test/Cramdown ..................................................29
    E.     Feasibility ......................................................................................29

XII. CAUSES OF ACTION ...........................................................................30

    A.     Preferences ....................................................................................30
    B.     Fraudulent Conveyances/Post-Petition Transfers .............................31
    C.     Other Litigation..............................................................................31
    D.     Disclaimer......................................................................................31

XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
    PLAN 32

    A.     Alternative Plans of Liquidation......................................................32
    B.     Liquidation Under Chapter 7 ...........................................................32

XIV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ....34

    A.     General ..........................................................................................34
    B.     Tax Consequences to Debtor............................................................34
    C.     Tax Consequences to the Reorganized Debtor..................................35
    D.     Tax Consequences to Creditors .......................................................35

XV. CONCLUSION.....................................................................................36

# I. **INTRODUCTION**

## A.    **General Information Concerning Disclosure Statement and Plan**

TAO-SAHI, L.P. (the "Debtor") submits this Disclosure Statement as may be amended from time to time ("Disclosure Statement") under § 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure to all of its known Creditors and Interest Holders.

The purpose of this Disclosure Statement is to disclose information adequate to enable the Creditors and Interest Holders to arrive at a reasonably informed decision in exercising the right to vote on the Proposed First Amended Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code (the "Plan").  A copy of the Plan is attached hereto as **Exhibit A**.  Capitalized terms used herein, if not separately defined, have the meanings assigned to them in the Plan or in the Bankruptcy Code and Bankruptcy Rules.

The Debtor has promulgated the Plan consistent with the provisions of the Bankruptcy Code. The purpose of the Plan is to provide the maximum recovery to each class of Claims in light of the assets and anticipated funds available for distribution to Creditors. The Debtor believes that the Plan permits the maximum possible recovery for all classes of Claims by facilitating a reorganization of the Debtor's Estate.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment you will receive under the Plan. It is submitted as an aid and supplement to your review of the Plan in an effort to explain the terms and implications of the Plan. Every effort has been made to explain fully various aspects of the Plan as it affects Creditors and Interest Holders. If any questions arise, the Debtor urges you to contact Debtor's counsel and every effort will be made to resolve your questions. You may, of course, wish to consult with your own counsel.

A general discussion of the projected assets and distributions under the Plan are set out below in this Disclosure Statement. The following summary is general in nature. Creditors and Interest Holders are referred to the full Disclosure Statement and Plan for a full discussion of these matters.

The Disclosure Statement is prepared to reflect all relevant information known to management as of the date of this Disclosure Statement. The Debtor is not aware of any events subsequent to such date that would materially affect this analysis. There can be no assurance that the assumptions underlying this analysis would be made or accepted by the Bankruptcy Court.

ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES AND AMOUNTS REFLECTED IN THIS ANALYSIS WILL BE REALIZED AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

After a plan has been filed with a bankruptcy court, it must be accepted by holders of impaired claims against, or interests in, a debtor.  Section 1125 of the Bankruptcy Code requires that a plan proponent fully disclose sufficient information about the debtor, its assets and plan to creditors and interest holders before acceptances of that plan may be solicited. This Disclosure Statement is being provided to the holders of Claims against, or Equity Interests in, the Debtor to satisfy the requirements of § 1125 of the Bankruptcy Code.

The Bankruptcy Code provides that creditors and interest holders are to be grouped into "classes" under a plan and that they are to vote to accept or reject a plan by class. While courts have not established exact rules on the proper method to be used in classifying creditors and interest holders, a general rule of thumb (which is subject to exceptions) is that creditors with similar legal rights are placed together in the same class and that interest holders with similar legal rights are placed together in the same class. For example, all creditors entitled to priority under the Bankruptcy Code might be placed in one class, while all creditors holding subordinated unsecured claims might be placed in a separate class. Generally, each secured creditor will be placed in a class by itself, because each such creditor usually has a lien on distinct property and, therefore, has distinct legal rights.

The Bankruptcy Code does not require that each claimant or interest holder vote in favor of a plan for the Court to confirm a plan. Rather, each class of claimants and interest holders must accept a plan (subject to the exception discussed below). A class of claimants accepts a plan if, of the claimants in the class who actually vote on a plan, such claimants holding at least two-thirds in dollar amount and more than one-half in number of allowed claims vote to accept the plan. For example, if a hypothetical class has ten creditors that vote and the total dollar amount of those ten creditors' claims is $1,000,000.00, then for such class to have accepted the plan, six or more of those creditors must have voted to accept the plan (a simple majority), and the claims of the creditors voting to accept the plan must total at least $666,667.00 (a two-thirds majority).

The Court may confirm a plan even though fewer than all classes of claims and interests vote to accept the plan. In this instance, the Plan must be accepted by at least one "impaired" class of Claims, without including any acceptance of the Plan by an insider. Section 1124 of the Bankruptcy Code defines "impairment" and generally provides that a claim as to which legal, equitable or contractual rights are altered under a plan is deemed to be "impaired."

If all impaired classes of claims and interests under a plan do not vote to accept a plan, the debtor is entitled to request that the Court confirm the plan pursuant to the "cramdown" provisions of § 1129(b) of the Bankruptcy Code. These "cramdown" provisions permit a plan to be confirmed over the dissenting votes of classes of claims and/or interests if at least one impaired class of claims votes to accept a plan (excluding the votes of insiders) and the Court determines that the plan does not discriminate unfairly and is fair and equitable with respect to each impaired, dissenting class of claims and interests.

Independent of the acceptance of a plan as described above, to confirm a plan, the Court must determine that the requirements of § 1129(a) of the Bankruptcy Code have been satisfied.

THE DEBTOR BELIEVES THAT THE PLAN SATISFIES EACH OF THE CONFIRMATION REQUIREMENTS OF § 1129(a) AND, IF NECESSARY, § 1129(b) OF THE BANKRUPTCY CODE.

The Bankruptcy Code requires that the Debtor solicit votes on the proposed Plan before the Plan can be confirmed by the Bankruptcy Court. Before the Debtor can solicit acceptances of the Plan, the Bankruptcy Court must approve this Disclosure Statement and determine that this Disclosure Statement contains information adequate to allow Creditors and Interest Holders to make informed judgments about the Plan. After Bankruptcy Court approval of this Disclosure Statement, the Disclosure Statement, the proposed Plan, and a ballot are sent to the holders of Claims and Interests. The creditors will then

have the opportunity to vote on the Plan and should consider this Disclosure Statement for such vote.

The Debtor will request that the Bankruptcy Court approve this Disclosure Statement as containing information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition for the Debtor's books and records to enable a hypothetical, reasonable investor typical of holders of Claims and Interests in the relevant classes to make an informed judgment whether to vote to accept or reject the Plan. The Bankruptcy Court's approval of this Disclosure Statement will not constitute an endorsement of any of the information contained in either the Disclosure Statement or the Plan. Likewise, except as set forth herein, although the Debtor and its counsel have utilized information believed to be accurate in preparing this Disclosure Statement, neither the Debtor nor any of its counsel warrant the accuracy for the information contained in or relied upon in preparing this Disclosure Statement, and any representation or warranty whatsoever, express, implied or otherwise set forth herein should not be construed to suggest that the Plan is free from risk, that acceptance or confirmation of the Plan will result in a risk-free or assured restructuring of the debts of the Debtor, or that the projections or plans of the Debtor for payment will be realized. If this Disclosure Statement is approved by the Court, it will be sent with the proposed Plan and a ballot for voting on the Plan, to Creditors and Interest Holders. The Court will also set a hearing to consider confirmation of the Plan.

At the hearing scheduled by the Court for confirmation of the Plan, the Court will consider whether the Plan should be confirmed. Section 1129 of the Bankruptcy Code contains the requirements for confirmation of a Plan. **YOUR VOTE IS IMPORTANT.** In order for the Plan to be accepted, at least two-thirds in amount and more than one-half in number of the **voting Creditors** in each class must affirmatively vote for the Plan. Even if all classes of Claims accept the Plan, the Bankruptcy Court may refuse to confirm the Plan. The Court must find that the Plan complies with the applicable provisions of the Bankruptcy Code and that the proponent of the Plan has also complied with the Bankruptcy Code. The Court must also find that the Plan has been proposed in good faith and not by any means forbidden by law. The Court must find that the proponent of the Plan, the Debtor, has disclosed the identity and affiliation of the persons who will manage the Debtor after confirmation, that the appointment of such persons is consistent with the interest of Creditors and Interest Holders and with public policy, and that the identity and compensation of any insiders that will be employed or retained by the reorganized Debtor have been disclosed. The Court must additionally find that each class of Claims has either accepted the Plan or will receive at least as much as it would under a Chapter 7 liquidation. The Code also provides for the treatment of certain Priority Claims. If any classes of Claims are impaired under the Plan, the Court must find that at least one class of Claims that is impaired has accepted the Plan without counting any votes by insiders. The Court must also find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtor. Additionally, the Plan must provide for payment of certain required fees to the United States Trustee.

In the event that the Plan is not accepted by all classes of Claims or Interests, the Debtor may attempt to obtain confirmation under what is known as "cram-down." To obtain confirmation by cram-down, the Court must find that the Plan does not discriminate unfairly and is fair and equitable with respect to each class of Claims or Interests that is impaired by the Plan and has not accepted the Plan. The Code provides several options for a plan to be "fair and equitable" to a secured creditor. Included among these options are that the secured creditor retains its lien and receives deferred cash payments at a market interest rate totaling either the value of the property securing the claim or the amount of the allowed claim as found by the Court, whichever is less. With respect to a class of

unsecured claims, the requirement that a plan be "fair and equitable" requires that the holder of an unsecured claim be paid the allowed amount of its claim or that no junior interest receive or retain any property on account of its claim.

**B.      Disclaimers.**

**NO SOLICITATION OF VOTES HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND SECTION 1125 OF THE BANKRUPTCY CODE, AND NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTOR TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. CREDITORS AND INTEREST HOLDERS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTOR OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR SUBMITTED HEREWITH.**

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, NO REPRESENTATION CONCERNING THE DEBTOR, ITS ASSETS, PAST OR FUTURE OPERATIONS, OR CONCERNING THE PLAN IS AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.**

**UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS**

CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF.

NEITHER DELIVERY OF THE DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT AND THE PLAN ATTACHED HERETO SHOULD BE READ IN THEIR ENTIRETY PRIOR TO VOTING ON THE PLAN. FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THE TERMS OF THE PLAN ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY.

## II. <u>HISTORICAL BACKGROUND</u>

A.  **The Debtor's Business**

The Debtor is a single-purpose Texas limited partnership formed in 2007, whose primary

operations consist of the ownership of a hotel opened in October 2009 – the Holiday Inn NW – Seaworld, located at 10135 State Hwy 151, San Antonio, Texas, 78251 (the "Hotel"). The Hotel is open, fully functional, and has had occupancy levels consistent with seasonal expectations. The Hotel is close to "market-stabilization," an industry concept indicating full integration into a new hotel's geographic area. The Hotel was recently recognized by its franchisor as having the most improved RevPAR (revenue per available room) in the franchisor's Central and South Texas regions. Attached hereto as **Exhibit B** is the latest available summary of the Hotel's performance report generated by Smith Travel Research, Inc. ("Star Report"). The Star Report Summary shows that occupancy rates forth the Hotel have increased 26.9% in the last twelve (12) months (versus 12.3% for the Hotel's competitors), the Hotel's ADR (average daily rate) has increased 6.8% in the last twelve (12) monthly (versus .07% for the Hotel's competitors), and the Hotel's RevPAR has increased 35.5% over the last twelve (12) months (versus 13.0% for the Hotel's competitors).[1]

HMC Hospitality Operating Company ("HMC") is the management company in charge of the day to day operations of the Hotel. HMC is not affiliated with the Debtor and does not own any equity position in the Debtor. Pursuant to a Hotel Management Agreement dated January 1, 2008, as amended, HMC receives a two and a half percent management fee from gross monthly revenues of the Hotel and has the right to reimbursement for certain other expenses.

Pursuant to the Hotel Management Agreement, as amended, the General Manager of the Hotel, Thomas Breen, is an employee of HMC, and the General Manager is the only HMC employee at the Hotel. The Debtor funds the General Manager's salary. The remaining employees who operate the Hotel on a day-to-day basis are provided to the Debtor pursuant to two Client Service and Co-Employment Agreements, entered into between Republic Hotel Management, LLC and Republic Hotel Staffing, LLC (collectively, the "Republic Entities"), each affiliated entities to the Debtor, and BMR, Inc. d/b/a CorpSol II ("Corporate Solutions"). Corporate Solutions is not affiliated with the Debtor.[2] Pursuant to the normal business practices of the Debtor and the terms of these two Co-Employment Agreements, each Hotel employee is co-employed by Corporate Solutions and one of the respective Republic Entities. Payroll services, including payment of payroll and benefits, are provided by Corporate Solutions, which then bills a respective Republic Entity for amounts expended. Each Republic Entity is then reimbursed for payroll expenses with Debtor funds from a Debtor bank account that is managed by HMC.

For the provision of payroll services, Corporate Solutions receives an additional 14% of payroll for Hotel restaurant employees and an additional 15% of payroll for non-restaurant Hotel employees. These additional amounts are used to pay employee taxes and insurance and Corporate Solution's fee. Further, each respective Republic Entity receives an additional 1.5% of payroll to reimburse that entity for its overhead and expenses.

---

[1]  According to the Star Report, the Hotel's competitors are the Holiday Inn Lackland SeaWorld Area (74 rooms), the Hilton San Antonio Hill Country Hotel (227 rooms), the Holiday Inn Express and Suites San Antonio West Sea World, the Fairfield Inn and Suites San Antonio Sea World, (98 rooms), the Comfort Inn Sea World Westover Hills (179 rooms), the Springhill Suits Sea World Lackland (116 rooms), and the Staybridge Suits Sea World (98 rooms).
[2]  The Republic Entities are 100% owned by TAO Management Group, LLC, which in turn is 100% owned by TAO Development Group, LLC, the Debtor's General Partner.

**B.      The Debtor's Structure**

The Debtor's general partner is TAO Development Group, LLC ("TAO Development"). TAO Development has a 3.4% ownership interest in the Debtor.  The CEO of TAO Development is Clayton Isom.  The CFO of TAO Development is Rashid Al-Hmoud.  TAO Development, through Mr. Al-Hmoud and Mr. Isom, provides management services to the Debtor.  Per the Debtor's Partnership Agreement, TAO Development is eligible to receive, but has not always received, an asset management fee of 1.5% of gross revenues for the general partner's overhead and expenses.  TAO Development is owned by Mr. Al-Hmoud (32%), ICS Investment (64%), and Wich Brenner (3%).  ICS Investment is 88.5% owned by Mr. Isom.  TAO Development, through Mr. Isom and Mr. Al-Hmoud, manage the business of the Debtor.  The Debtor's limited partners are some 18 separate individuals and entities holding varying percentages of ownership in the Debtor.  The identity of the limited partners and their respective percentage ownership interests are disclosed in the attachment filed with the Debtor's Statement of Financial Affairs, response to Question No. 21(a).

**C.      Circumstances Leading to Bankruptcy**

The Debtor developed the Hotel from its inception.  In April of 2008, the Debtor closed an $18,633,336.00 secured construction loan with Specialty Finance Group LLC, a Georgia limited liability company ("SFG"), and subsidiary of Silverton Bank N.A ("Silverton").  A component of the loan agreement with SFG was the requirement that the Debtor enter into a "Confirmation Letter" with Silverton to provide the Debtor with interest rate protection in the form of a hedge agreement ("Hedge Agreement").  Although a master hedge agreement was never executed by the parties, Silverton's successor has taken the position that the Debtor is nonetheless bound by the general terms of the Hedge Agreement as set forth in the Confirmation Letter.  Construction of the Hotel commenced soon after entering into the loan agreement with SFG.  On May 1, 2009, before the Hotel was completed, Silverton failed and was closed, and the FDIC was named receiver for Silverton.  The FDIC also took control of the assets and operations of SFG.  The Debtor faced substantial challenges in communicating with its effective new "lender," the FDIC, and completion of the Hotel was thus delayed by several months, to October 2009.  The delay in the opening of the Hotel was costly to the Debtor, as the peak vacation and occupancy season for the Hotel had passed.  Specifically, the Debtor, among other things, had to incur additional costs that were not accounted/budgeted for in the original budget, such as paying interest for a longer period of time, having to pay extra fees to a management company that was already on the ground, and having to pay salaries of several managers who were hired in May 2009 in anticipation of opening during peak summer months.  At the same time, the FDIC began to invoice, and the Debtor began to pay, the amounts allegedly due under the Hedge Agreement.  Amounts invoiced and paid under the Hedge Agreement, starting in September 2009, were an average of $60,000 per month, putting further strain upon the Debtor and its operations.  The Debtor's partners made loans to the partnership to sustain operations at the Hotel.  TAO Development did not receive its asset management fee when funds were unavailable during this time period.

Throughout 2010 and early 2011, the Debtor engaged in discussions with FDIC representatives, to take into account the changed circumstances arising from the original lender's failure and consequential delays, and in an attempt to stabilize the Debtor's overall debt and repayment structure under the debt facility.

On November 30, 2010, the FDIC announced to the Debtor that it was interested in selling the loan at a market-rate discount. Discussions with the FDIC continued into early 2011. In January 2011, the FDIC notified the Debtor that it was only interested in selling the loan at 100% of face value.

Final discussions with the FDIC occurred on March 3, 2011. During that conversation, the FDIC informed the Debtor that the FDIC intended to sell the Debtor's loan as a piece of a package of hotel loans made by the failed Silverton Bank. On April 9, 2011, S2 Acquisition LLC ("S2 Acquisition"), an "opportunity fund" associated with Square Mile Capital Management in New York, New York, informed the Debtor in writing that S2 Acquisition had purchased the construction loan from the FDIC. In spite of the FDIC's prior insistence that the loan be redeemed at 100% of its face value, upon information and belief, S2 Acquisition acquired the loan from the FDIC for approximately 80% of its face value. On April 26, 2011, the Debtor received a letter from S2 Acquisition which contained notice of S2 Acquisition's acceleration of the loan and demand for the entire principal balance of the loan, accrued interest, default interest and late fees. The letter provided the Debtor ten (10) days to pay these sums in full.

S2 Acquisition posted the real property associated with the Hotel for a June 2011 foreclosure. The Debtor continued an effort to negotiate with S2 Acquisition for reinstatement of the loan, but these efforts ultimately proved unsuccessful.

On June 7, 2011 ("Petition Date"), the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code, among other things, to enable it to restructure its obligations to S2 Acquisition in accordance with the rights of a debtor-in-possession subject to title 11, to provide a dividend to the Debtor's remaining creditors, and to emerge as a successfully reorganized entity following the confirmation of a plan.

**D.      The Chapter 11 Case**

On June 7, 2011, the Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code styled *In re TAO-SAHI, LP,* Case No. 11-52027 (the "Bankruptcy Case") in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "Bankruptcy Court").

**E.      The Debtor's Assets and Schedules**

On the Petition Date, the Debtor's sole real property asset was the property associated with the Hotel.

As of the Petition Date, the Debtor claims an interest in certain assets including, but not necessarily limited to, the following:

| **Asset Description** | **Scheduled Amount** |
|---|---|
| Bank Accounts | $235,728.76 |
| Receivables | Variable |
| Real Property/FF&E | $24,500,000 |
| Breach and tort claims against SFG and FDIC entities | Value unknown |

The Debtor timely filed its Schedule of Assets and Liabilities and Statement of Financial Affairs with the Bankruptcy Court, on June 21, 2011 [Dckt. No. 36]. In the aggregate, the Debtor's scheduled pre-petition unsecured claims total approximately $1,603,421.10.[3] The Debtor's scheduled secured claims total approximately $18,980,644.43. In addition to claims scheduled by the Debtor, Proofs of Claim have been or will be filed against the Debtor. The Proof of Claim deadlines in the case are October 11, 2011, for non-governmental entities, and December 5, 2011, for governmental entities. The Debtor will examine all filed Claims. Upon completion of this examination, it is expected that substantive objections to certain Claims will be filed.

The cash flow forecast attached hereto as **Exhibit C** shows the anticipated income to the Debtor and payment of expenses from continued operations of the Hotel through 2016. The Debtor believes that the cash flow estimates set forth in **Exhibit C** are reasonable and achievable.

## F.     Post-Petition Operations

The Hotel continues to operate as normal under the authority granted to it by the Bankruptcy Court. The Debtor continues to enjoy occupancy levels consistent with seasonal expectations and continues to operate at a expected levels of profitability.

On June 8, 2011, the Debtor filed its Motion to Reject Interest Rate Hedge Agreement as Executory Contract Pursuant to 11 U.S.C. § 365 ("Motion to Reject"). By the Motion to Reject, the Debtor sought authority to reject the Hedge Agreement (to the extent that the agreement is executory) as of the Petition Date. The FDIC did not respond to the Motion to Reject and the Court entered its order approving the Motion to Reject on July 18, 2011 [Dckt. No. 60].

After the entry of the interim orders to permit the Debtor's use of cash collateral on a post-petition basis, on July 8, 2011, the Bankruptcy Court entered the Agreed Order Pursuant to Sections 105, 361, 362, 363, and 507 of the Bankruptcy Code for Authority to Use Cash Collateral in the Ordinary Course, Provide Adequate Protection, and for Preliminary and Final Hearings ("Cash Collateral Order"). The Cash Collateral Order represents the agreement between the Debtor and S2 Acquisition for the Debtor's use of cash, and also provided, among other things, for monthly adequate protection payments to S2 Acquisition of $40,170.89, the payment of S2 Acquisition's

---

[3]   Due to the subsequent receipt of invoices related to pre-petition good and services, it is likely the Debtor will amend its Schedules accordingly.

attorney's fees up to $10,000 a month, and for a defined review period for the Debtor, and other parties in interest, to review the liens and Claims of S2 Acquisition.

The Debtor also sought and obtained orders permitting the Debtor to use existing bank accounts and business forms [Dckt. No. 21], to pay pre-petition wages [Dckt. No. 40], for the provision of adequate assurance for utilities [Dckt. No. 62], and for the Debtor to utilize a limited service list [Dckt. No. 73].

On July 11, 2011, Mr. Al-Hmoud appeared for the Debtor and testified at the Debtor's 341 First Meeting of Creditors. The meeting was concluded. The US Trustee's representative filed a notice on July 15, 2011 [Dckt. No. 54], indicating that an official committee of unsecured creditors would not be formed in the case.

In July 2011, counsel for Holiday Hospitality Franchising, Inc. ("Franchisor") contacted Debtor's counsel to demand payment of approximately $70,000 in pre-petition franchise fees. The Franchisor also asserted that because the franchise agreement was nominally between the Franchisor and TAO Development (i.e. not the Debtor), the Franchisor could terminate the franchise agreement in the absence of payment, without violating the automatic stay. To resolve matters with the Franchisor, on July 27, 2011, the Debtor filed its Motion for Authority to Pay in the Ordinary Course of Business Pre-Petition Claims Related to Franchisor ("Franchisor Motion"). By the Franchisor Motion, the Debtor sought authority to pay pre-petition amounts owed under the franchise agreement in order to preserve the franchise agreement and the relationship with the Franchisor – both of which are essential to the success of the Hotel and the Debtor. On August 22, 2011, the Bankruptcy Court entered an order approving the Franchisor Motion.

## G.    Retention of Professionals

The Debtor has obtained approval from the Bankruptcy Court for the retention of professionals pursuant to § 327 of the Bankruptcy Code. The Debtor retained the law firm of Jackson Walker L.L.P. ("Jackson Walker") as bankruptcy counsel for the Debtor in this Chapter 11 Case. Prior to the Petition Date, Jackson Walker received a $100,000 retainer for anticipated pre-petition and post-petition fees and costs ("Pre-Petition Retainer"). Jackson Walker applied $31,628.80 for pre-petition fees and services. On June 21, 2011, the Debtor filed its Application to Approve Employment of Jackson Walker L.L.P. as Bankruptcy Counsel for the Debtor [Dckt. No. 35]. On July 18, 2011, the Bankruptcy Court entered its order approving the employment of Jackson Walker as the Debtor's bankruptcy counsel [Dckt. No. 61]. The Debtor has also retained Bolton Real Estate Consultants, Ltd. ("Bolton") to act as appraiser for the Estate [Dckt. No. 57].

On July 27, 2011, the Debtor filed its Motion for Establishing Monthly Professional Fee and Expense Reimbursement Procedures ("Professional Fee Motion") [Dckt. No. 68]. Pursuant to the Professional Fee Motion, the Debtor sought approval of a professional fee review and payment process, which would provide for periodic payment of professional fees (subject to certain "hold-backs"), pending final allowance of fees by the Court. At a hearing before the Bankruptcy Court on August 24, 2011, the Court approved the Professional Fee Motion.

## H.    Litigation Against SFG, the FDIC Entities, and S2 Acquisition

After investigation of potential claims, on August 12, 2011, the Debtor commenced Adv. Pro. No. 11-5129 ("SFG Adversary") by filing its original complaint ("Complaint") with the Bankruptcy Court. In the Complaint, the Debtor asserted claims and causes of action against defendants SFG, and the FDIC, as Receiver for Silverton Bank Bank ("FDIC-R-Bank"), and the FDIC as receiver for Silverton Bridge Bank ("FDIC-R-Bridge;" with FDIC-R-Bank, the "FDIC Entities"), based upon delays in honoring draw requests made under the loan agreement with SFG for construction of the Hotel. The delays were a breach of the loan agreement and caused damages to the Debtor in amounts to be determined at trial. Specific claims against SFG and the FDIC Entities in the SFG Adversary include breach of contract and tortious interference with contracts. The Debtor is continuing to review the enforcement of the Hedge Agreement by one or more of the FDIC Entities, and may amend the Complaint accordingly, for damages related to the Hedge Agreement and/or to recover amounts paid to one or more of the FDIC Entities under the Hedge Agreement. Also in the SFG Adversary, the Debtor objected to the claims and liens asserted by S2 Acquisition, based upon defenses to the enforcement of the note and loan agreement (originally with SFG) arising from claims against SFG and the FDIC Entities. The Debtor also seeks to equitably subordinate the liens and claims of S2 Acquisition on the same basis. The Debtor will continue to pursue its remedies in the SFG Adversary after the confirmation of the Plan, if necessary, and will work to obtain a trial date in 2012.

On August 5, 2011, S2 Acquisition filed a Complaint in the Northern District of Texas, Lubbock Division, Case No. 5:11-cv-11-00143-C; *S2 Acquisition v. Clayton Isom, Rashid Al-Hmoud, and John Sellers* ("Guarantor Suit"). In the Guarantor Suit, S2 Acquisition asserts that Clayton Isom, Rashid Al-Hmoud, and John Sellers (the "Guarantors") executed a personal guaranty of the Debtor's obligations to S2 Acquisition, and the amounts guaranteed are immediately due and payable.

Mr. Al-Hmoud and Mr. Isom are the Debtor's principals, and they will each play essential roles in managing the affairs of the Debtor through and including the confirmation process, and thereafter. Mr. Al-Hmoud and Mr. Isom will personally contribute funds in support of the Plan, and each will solicit new contributions from the existing limited partners, and perhaps others, in support of the Plan. The Debtor's limited partners are either relatives or business acquaintances of Mr. Al-Hmoud and Mr. Isom, and thus, these gentlemen are irreplaceable. To avoid the distractions associated with the Guarantor Suit, to avoid potential inconsistent results between the Debtor's case and the Guarantor Suit, and to adjudicate the claims between the Debtor and S2 Acquisition most efficiently, concurrently with the filing of the SFG Adversary, the Debtor filed its Motion to Extend the Automatic Stay, or in the Alternative, for Injunctive Relief ("Motion to Extend") [SFG Adv. Pro. Dckt. No. 3]. By the Motion to Extend, the Debtor sought to preclude the pursuit of the Guarantor Suit for 90 days, or to confirmation of the Debtor's Plan.[4] A hearing on the Motion to Extend was held before the Bankruptcy Court on August 31, 2011, at which time, the Bankruptcy Court denied the Motion to Extend, without prejudice to the Debtor's right to seek a preliminary injunction against the Guarantor Suit at a later time. The Plan contains a preliminary injunction against the pursuit of

---

[4]  Although Mr. Sellers is no longer associated with the Debtor, the Debtor sought to preclude the pursuit of the Guarantor Suit against Mr. Sellers (as well as against Mr. Isom and Mr. Al-Hmoud), because Mr. Sellers has filed a proof of Claim [Claim No. 14-1] against the Debtor based upon his contingent liability under the Guarantor Suit, and because Mr. Sellers has made demands for indemnification against Mr. Isom and Mr. Al-Hmoud personally, based upon his potential liability under the Guarantor Suit.

the Guarantor Suit so long as the Reorganized Debtor is not in default of its Plan payment obligations to S2 Acquisition.

The Debtor filed its initial proposed Plan on August 29, 2011, the First Amended Plan supersedes and replaces the prior filed proposed Plan.

## III.  SUMMARY OF THE PLAN

An overview of the Plan is set forth below.  This overview is qualified in its entirety by reference to the Plan.  A true and correct copy of the First Amended Plan is attached hereto as **Exhibit A** and is incorporated by reference herein for all purposes.  If the Court confirms the Plan and, in the absence of any applicable stay, and all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.  Funding for the Plan payments will be from the Reorganized Debtor's operations, recoveries from the SFG Adversary, and a $500,000 contribution from the Debtor's current or new Interest Holders ("New Equity Contribution"). The business of the Reorganized Debtor shall continue to be managed by its general partner, TAO Development, through Mr. Isom and Mr. Al-Hmoud, CEO and CFO of TAO Development, respectively, pursuant to the Plan and the Debtor's Partnership Agreement.  TAO Development shall continue to receive its asset management fee of 1.5% of gross revenue of the Reorganized Debtor to defray the overhead and expenses incurred by TAO Development; provided, however, that TAO Development shall not receive its asset management fee before all Plan payments and other obligations for any given month are paid in full.  The Debtor will assume the existing management agreement with HMC for operation of the Hotel.  Staffing for the Hotel shall continue to be provided by Corporate Solutions and the Republic Entities per the arrangements described herein.

The following summary of Claims is derived from the Debtor's schedules, books and records, and a review of the Claims filed in this proceeding. THE EXACT AMOUNT OF EACH CLAIM FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE PLAN, AND THE SUBSEQUENT DISCHARGE WILL BE AS STATED IN THE DISCLOSURE STATEMENT AND PLAN EXCEPT THAT A PROOF OF CLAIM FILED BY A CREDITOR IS PRIMA FACIE EVIDENCE OF THE AMOUNT OF THE CLAIM, UNLESS AN OBJECTION TO THE PROOF OF CLAIM IS FILED. THOSE CLAIMS WHICH ARE LISTED AS DISPUTED IN THIS DISCLOSURE STATEMENT WILL BE SETTLED BY AGREEMENT OF THE PARTIES OR BY THE COURT BEFORE DISTRIBUTION UNDER THE PLAN OCCURS. NOTWITHSTANDING ANYTHING HEREIN OR IN THE PLAN TO THE CONTRARY, IDENTIFICATION OF ANY CLAIM OR CLAIM AMOUNT HEREIN OR IN THE PLAN SHALL NOT RESULT IN THE ALLOWANCE OF SUCH CLAIM.

EACH CREDITOR WILL BE PAID IN THE MANNER SET FORTH BELOW WHICH APPLIES TO THAT PARTICULAR CREDITOR.

## IV.  CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.  General Provisions and Classifications

Each holder of an Allowed Administrative Expense against the Debtor shall receive, at the Reorganized Debtor's option (i) payment in full in Cash on account of such Allowed Administrative Expense on the later of thirty (30) days after the Effective Date; or (ii) the amount of such holder's Allowed claim in accordance with the ordinary

business terms of such expense or costs, or (iii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor or as ordered by the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Reorganized Debtor is authorized to pay in the ordinary course any Administrative Expense representing a liability incurred in the ordinary course of business by the Debtor. Payment of Allowed Administrative Expenses shall be from the New Equity Contribution, or from the Debtor's and Reorganized Debtor's operations, unless otherwise agreed. Through August 23, 2011, Jackson Walker has accrued approximately $170,000 in fees and costs for representing the Debtor on a post-petition basis, and Bolton has accrued fees and costs in the approximate amount of $15,000.[5]  The amounts are subject to Allowance by order of the Bankruptcy Court.

All outstanding quarterly trustee's fees pursuant to 28 U.S.C. § 1930(a)(6) shall be paid by the Reorganized Debtor on the Effective Date, and thereafter as the same may become due.

Non-Class 1 Claimants are not a true Class and shall not be entitled to vote on the Plan.

The Debtor expects, by the Plan, to establish an Administrative Claim Bar Date as thirty (30) days after the Effective Date of the Plan. Except for professionals approved by the Bankruptcy Court under 11 U.S.C. § 327, any holder of a Claim under 11 U. S. C. §§ 503 and/or 507 that fails to file their Claim(s) by the Administrative Claims Bar Date shall be forever barred from asserting such Claim(s) against the Debtor or its Estate, and the Debtor and its Estate will be forever discharged from any and all indebtedness or liability with respect to such Claim.  Section 503(b)(9) of the Bankruptcy Code provides that claims for goods received by a debtor twenty (20) days prior to the commencement of a bankruptcy case may be treated as an Administrative Expense.  To date, Ben E. Keith Co. has requested Allowance of $19,779.82 as an Administrative Expense pursuant to § 503(b)(9).  If Allowed as an Administrative Expense, the Claim of Ben E. Keith Co. will be paid in accordance with the terms of the Plan.  The Debtor has made every effort to remain current on its post-petition liabilities, and thus the Debtor does not expect significant non-Professional Person Administrative Claims to be filed.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including without limitation, voting, confirmation and distributions under the Plan and under §§ 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular class only to the extent that the Claim or Equity Interest qualifies within the description of that class, and shall be deemed classified in a different class to the extent that the remainder of such Claim or Equity Interest qualifies within the description of such different class. A Claim or Equity Interest is in a particular class only to the extent that such Claim or Equity Interest is Allowed in that class and has not been paid or otherwise settled before the Effective Date.

The Classification of Claims and Equity Interests pursuant to the Plan is as follows:

**Class 1:**   **Secured Claims of Taxing Authorities**
**Class 1(a):**  **Allowed Priority Tax Claims**

---

[5]  Per the Cash Collateral Order, the Debtor is accruing $25,000 per month for Jackson Walker's fees and costs, and some $68,371.20 remains of the Pre-Petition Retainer.  Thus, through the end of August, the amount of approximately $143,371.20 is available for application to Jackson Walker fees and costs, once Allowed by the Bankruptcy Court.  Likewise, pursuant to the Cash Collateral Order, the Debtor has accrued amounts for payment of Bolton's fees and costs, once Allowed.

| | |
|---|---|
| **Class 2:** | **Allowed Priority Non-Tax Claims** |
| **Class 3:** | **Allowed Secured Claims of S2 Acquisition, LLC** |
| **Class 4:** | **Allowed General Unsecured Claims** |
| **Class 4(a):** | **Convenience Class Claims** |
| **Class 5:** | **Limited Partner Loan Claims** |
| **Class 6:** | **Subordinated Claims of Insiders** |
| **Class 7:** | **Equity Interests** |

## B.    Classification and Treatment of Claims and Equity Interests

The classes of Claims against and Equity Interests in the Debtor shall be treated under the Plan as follows:

## Class 1 – Secured Claims of Taxing Authorities.

### Treatment & Funding

Class 1 is primarily composed of the Allowed Secured Claim of Bexar County, Texas, and the City of San Antonio (and any other allowed secured and Priority Tax Claims treated within this class). Bexar County filed a Proof of Claim (Claim No. 1) for 2011 ad valorem taxes in the secured amount of $370,874.05.  The Debtor's records show the City of San Antonio as having occupancy tax clams of $29,918.33.  These claims total approximately $400,792.38, and shall be treated as fully secured. The Taxing Authorities shall retain their liens until their Allowed Secured Claims have been paid in full.  Beginning the later of one month after the Effective Date of the Plan, the date that the Taxing Authority's Claims become Allowed, or the month before the date such Taxing Authority's Claims become past due, the Reorganized Debtor shall pay any such unpaid Allowed Secured Claim from the Reorganized Debtor's operations in full in sixty equal monthly installments as provided for under 11 U.S.C. § 1129(a)(9)(C) and (D), which shall include interest at the rate provided by statute.  11 U.S.C. § 511; Texas Tax Code § 33.01(a).  The Reorganized Debtor will pay required future ad valorem and other taxes as they become due.

The Reorganized Debtor shall pay the Allowed Secured Claims as described in this Section with funds received from continuing operations of the Hotel.  Allowed Secured Claims will retain their security interests in the same priority, extent and validity that such liens held immediately prior to the Petition Date.

### Impairment and Voting

Class 1 is impaired.  Acceptance of the Plan from the Taxing Authorities will be solicited.

## Class 1(a): Texas Comptroller Priority Tax Claim.

The Debtor's records show the Comptroller of Public Accounts as having sales tax and state occupancy Tax Claims totaling $25,404.03.

### Treatment and Funding.

Beginning the later of one month after the Effective Date of the Plan, the date that the Taxing Authorities' Claims in this Class become Allowed, or the month before the date such Taxing Authorities' Claims become past due, the Reorganized Debtor shall pay any such unpaid Allowed Claim from the Reorganized Debtor's operations in full in sixty (60) equal monthly installments as provided for under 11 U.S.C. § 1129(a)(9)(C) and (D), which shall include interest at the rate provided by statute. 11 U.S.C. § 511; Texas Tax Code § 33.01(a). The Reorganized Debtor shall pay the Allowed Claims in this Class with funds received from continuing operations of the Hotel. The proof of claim deadline for governmental entities (December 5, 2011) has not expired. For informational purposes, the estimated total of Claim Class 1(a) Claims is $25,404.03**.**

### Impairment & Voting

Class 1(a) is impaired. Acceptance of the Plan from Class 1(a) Claimants will be solicited.

## Class 2 - Allowed Non-Tax Priority Claims.

### Treatment & Funding

The Debtor shall pay Allowed Non-Tax Priority Claims, if any, in full without interest or penalty one month after the Effective Date. For employees of the Hotel who continue to be employed at the Hotel, claims for accrued vacation and sick leave or other benefits will be paid in the ordinary course of the Reorganized Debtor's business in accordance with the usual policies of the Debtor and the employer of each employee.

### Claim Holders

The Debtor anticipates claims in this class will be $0.00.[6]

### Impairment & Voting

Claimants in Class 2 are impaired. Acceptance of the Plan from such Claimants, if any, will be solicited.

## Class 3 -Secured Claim of S2 Acquisition, LLC.

### Treatment & Funding

S2 Acquisition has asserted it is owed more than $20,400,000.[7] S2 Acquisition asserts that its Claims are secured by a deed of trust for the Hotel, and by a UCC-1 in most of the Debtor's remaining assets. The Claims and liens of S2 Acquisition as Disputed by the Debtor. The Debtor disputes the claimed amount and has objected to S2 Acquisition's Claim and lien in the SFG Adversary. S2 Acquisition shall be granted an Allowed Secured Claim in the amount to be determined in the SFG

---

[6] The Debtor scheduled $4,159.74 in priority wage claims for persons employed at the Hotel, but these claims were paid pursuant to the Court's Order Granting Debtor's Amended Emergency Motion for Authority to Pay Prepetition Wages, Salaries, and Other Compensation, entered on June 27, 2011 [Dckt. No. 40].
[7] *See* Limited Objection of S2 Acquisition filed June 17, 2011 [Dckt. No. 17].

Adversary. The Claims of S2 Acquisition, to the extent Allowed, are treated as fully secured under the Plan. The Reorganized Debtor shall pay the Allowed Secured Claim of S2 Acquisition as follows: The S2 Acquisition Note shall be modified to provide that the Debtor shall make monthly interest-only payments under the S2 Acquisition Note at the non-default interest rate provided in the S2 Acquisition Note, for the first twelve (12) months following the Effective Date of the Plan. Following the twelfth interest-only payment, the Debtor shall make monthly payments of principal, at a 25-year amortization, plus interest at the non-default rate as provided in the S2 Acquisition Note. The S2 Acquisition Note, as modified herein, shall provide for written notice and ten (10) business days' opportunity to cure for any missed payments before any default may be declared. The remaining portion of the Allowed Secured Claim owed to S2 Acquisition shall be paid within thirty (30) days of the tenth anniversary of the Effective Date. The Reorganized Debtor may pay the balance of the Claim of S2 Acquisition at any time before such date, without penalty. The Reorganized Debtor shall pay the Allowed Secured Claim as described in this Section with funds received from continuing operations of the Hotel.

The liens of S2 Acquisition, as determined in the SFG Adversary, shall continue to be enforceable against the Reorganized Debtor's property to the same extent, priority and validity such liens were entitled to as of the Petition Date. Until such time as the Claims of S2 Acquisition become Allowed Claims, the Reorganized Debtor shall continue to make monthly payments only to S2 Acquisition in the amount of $40,170.89 only, as agreed by S2 Acquisition as adequate protection payments under the Cash Collateral Order. Once Allowed, the Claims of S2 Acquisition shall be treated in accordance with the applicable provisions of the Plan.

**SO LONG AS THE REORGANIZED DEBTOR IS NOT IN DEFAULT OF ITS PAYMENT OBLIGATIONS TO S2 ACQUISITION, S2 ACQUISITION AND ANY OTHER PERSON SEEKING TO ENFORCE RIGHTS AND REMEDIES RELATED TO THE S2 ACQUISITION NOTE, SHALL BE ENJOINED AND MAY NOT PURSUE THE GUARANTORS OR ANY OTHER THIRD PARTY IN THE GUARANTOR SUIT, OR IN ANY OTHER ACTION. THE INJUNCTION PROVIDED HEREIN IS TEMPORARY, AND SHALL EXPIRE UPON THE REORGANIZED DEBTOR'S FAILURE TO CURE MISSED PAYMENTS TO S2 ACQUISITION UNDER THE PLAN. TO THE EXTENT NECESSARY, ANY APPLICABLE STATUTE OF LIMITATIONS AGAINST COLLECTION FROM ANY THIRD PARTY IS SPECIFICALLY TOLLED FROM THE PETITION DATE UNTIL THE DATE UPON WHICH THE DEBTOR FAILS TO CURE A WRITTEN NOTE OF DEFAULT OF ITS OBLIGATIONS TO S2 ACQUISITION UNDER THIS PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PLAN, THE GUARANTORS AND ANY OTHER PERSON CO-LIABLE WITH THE DEBTOR OR REORGANIZED DEBTOR, FOR PAYMENT OBLIGATIONS UNDER THE S2 ACQUISITION NOTE, SHALL NOT BE RELEASED FROM SUCH OBLIGATIONS BY THE TERMS OF THIS PLAN, UNLESS AND UNTIL S2 ACQUISITION IS PAID IN FULL IN ACCORDANCE WITH THE TERMS OF THIS PLAN.**

**Impairment and Voting.**

The Claimant in Class 3 is impaired. Acceptance of this Plan from the Class 3 Claimant will be solicited.

## Class 4 - Allowed General Unsecured Claims.

### Treatment & Funding

The Reorganized Debtor shall pay the Allowed General Unsecured Claims, with the exceptions noted below and not including Equity Interest Holders, with quarterly payments plus interest commencing the Effective Date at the WSJ Prime Rate, with the first such payment to occur within thirty (30) days of the first calendar quarter after later of (a) the Effective Date, or (b) when such Claim becomes an Allowed Claim. Should Allowed Class 4 Claims total less than $100,000, quarterly payments shall be made as provided herein so that such Claims are paid in full within two (2) years of the Effective Date of the Plan. If Allowed Class 4 Claims total between $100,000 and $200,000, quarterly payments shall be made as provided herein so that such Claims are paid in full within three (3) years of the Effective Date of the Plan. If Allowed Class 4 Claims total more than $200,000, but less than $300,000, such claimants shall receive quarterly payments as provided herein so that such Claims are paid in full within four (4) years of the Effective date of the Plan. If Allowed Class 4 Claims exceed $300,000, such claimants shall receive quarterly payments as provided herein so that such Claims are paid in full within five (5) years of the Effective Date of the Plan. The Reorganized Debtor may, in its discretion, pay Allowed Class 4 Claims in full before the time periods set forth herein, provided that the Reorganized Debtor is able to meet its other Plan obligations without default.

### Claim Holders

Excluding Cure Claims, limited partner loans, and the subordinated Claims of TAO Development, the Debtor's books and records show approximately $29,263.21 in Claims to be treated in this class.

### Impairment & Voting

The Class 4 Claimants are impaired. Acceptance of this Plan from the Class 4 Claimants will be solicited.

## Class 4(a) -- Convenience Class Claims.

As permitted under § 1122(b) of the Bankruptcy Code, Unsecured Claims in Class 4 in an Allowed amount of $1,000 or less, may opt-in to Class 4(a). Class 4(a) Claimants will receive 75% of their Allowed Unsecured Claims, without interest, within thirty (30) days of the Effective Date in full satisfaction of their Allowed Unsecured Claims.

### Claim Holders

According to the Debtor's books and records, approximately twenty-seven (27) Class 4 Claim Claimants would qualify for treatment under Class 4(a).

**Impairment & Voting**

The Class 4(a) Claimants are impaired. Acceptance of the Plan from the Class 4(a) Claimants will be solicited.

## Class 5 – Limited Partner Loan Claims.

Class 5 shall consist of limited partner loan Claims. Class 6 Claimants shall receive no distributions on their Claims, until all allowed Claims in Class 1, 1(a), 2, 4, and 4(a) are paid in full. Class 5 Claims will not accrue interest. Limited partner loan claims total the approximate amount of $439,745.00.

Per the Debtor's books and records, limited partner loan Claims are held by the individuals and entities shown below, with amounts shown:

| Creditor Name | Amount |
|---|---|
| Ben Ralston | $11,493.00 |
| Lugano, Ltd. | $5,000 |
| J&N Investment | $22,992.00 |
| Michael Owen, MD | $22,992.00 |
| Paul Chebib, MD | $22,992.00 |
| A&L Sharif Family, LLP | $8,000 |
| MD_Real2007 Ltd. | $61,200 |
| Lynne J Woodward Ltd | $45,979.00 |
| Pedro Chavez, MD | $22,992.00 |
| John Sellers | $15,000 |
| Qubty Enterprises, Ltd. | $11,493.00 |
| Cambrain Coral Properties | $193,612.00 |

**Impairment and Voting.**

The Class 5 Claims are impaired. Acceptance of the Plan from Class 5 Claimants will be solicited.

## Class 6 – Subordinated Claims of TAO Development.

Class 6 shall consist of the general partner loan Claims of TAO Development. The Class 6 Claimant shall receive no distributions on its Claims, until all Allowed Claims in Class 1, 1(a), 2, 4, and 4(a), are paid in full. Class 6 will not accrue interest.

TAO Development is scheduled by the Debtor as having an unsecured Claim in the amount of $565,912.00.

**Impairment and Voting.**

The Class 6 Claim is impaired. Acceptance of the Plan from the Class 6 Claimant will be solicited.

## Class 7 - Equity Interests.

**Treatment & Funding**

Except as set forth below, none of the Equity Interest holders of the Debtor shall retain any Equity Interest in the Reorganized Debtor. In exchange for the New Equity Contribution, the terms and conditions provided herein, and limited partner obligations pursuant to the Partnership Agreement, each holder of an Equity Interest in the Debtor's partnership shall retain its partnership interest in the Reorganized Debtor. The existing partners of the Debtor shall have the option to fund their pro-rata share of the New Equity Contribution in the same percentages as originally contributed to the Debtor by such Equity Holders. In the event one of the current partners elects not to contribute their pro rata share of the New Equity Contribution, one or more of the remaining partners, or a new limited partner, will assume the such non-funding partner's pro-rata share in exchange for an increase in such partner's share in the Reorganized Debtor, and corresponding decrease in the non-funding partner's Equity Interest in the Reorganized Debtor. No payment of cash will be made to holders of Equity Interests.

The New Equity Contribution shall be $500,000 payable to Reorganized Debtor to be used for the purposes set forth herein on or before the Effective Date.

Notwithstanding anything herein or in the Plan seemingly to the contrary, there shall be absolutely no obligation to fund any of the New Equity Contribution unless the Plan is confirmed by order of the Court.

In addition to the New Equity Contribution, all Equity Interests in the Reorganized Debtor shall be held by TAO Development in escrow for the benefit of the Estate's Class 4 creditors, and shall not fully vest in the post-confirmation Equity Interest holders, until all Claimants in Classes 1, 1(a), 2, 4, and 4(a) are paid in full in accordance with provisions of the Plan. No dividends or distributions will be made to holders of Equity Interests in the Reorganized Debtor until all Claimants in Classes 1, 1(a), 2, 4, and 4(a) are paid in full in accordance with the provisions of the Plan.

**Impairment & Voting**

The Class 6 Equity Interests are impaired. Acceptance of this Plan from the Class 6 Equity Interests will be solicited.

## Multiple Claims and Interests.

To the extent that a Creditor or an Interest Holder has more than one Claim or Interest in a single class, such Claims or Interests shall be aggregated and treated as a single Claim or as a single Interest. To the extent that a Creditor and/or Interest Holder has Claims and/or Interests in different classes, such

Claims and/or Interests shall not be aggregated. Notwithstanding the foregoing, Creditors who have filed duplicate claims for the same debt against the Debtor shall be entitled to the allowance of only one Claim in the Debtor's bankruptcy case.

## V. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF IMPAIRED CLAIMS

### A. Classes Entitled to Vote

Any creditor of the Debtor whose Claim is impaired under the Plan is being solicited to vote, if either (i) its Claim has been scheduled by the Debtor and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) it has filed a Proof of Claim or Interest on or before the Bar Date set by the Bankruptcy Court for such filings. Any Claim as to which an objection has been filed, and such objection is still pending on the voting date, is not entitled to have its vote counted, unless the Bankruptcy Court temporarily allows the Claim upon motion by such creditor whose Claim has been objected to, in an amount which the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan. Such motion must be heard and determined by the Bankruptcy Court prior to the date and time established by the Bankruptcy Court to confirm the Plan. In addition, a creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### B. Claim Class Acceptance Requirement

The Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims of that class which actually cast ballots for acceptance or rejection of the plan. In other words, acceptance takes place only if two-thirds in dollar amount and majority in number of the creditors in a given class who vote cast their ballots in favor of acceptance.

### C. Presumed Acceptance/Rejection of Plan

Classes 1 through 7 are impaired Classes. Any impaired Class of Claims that has a single member who does not vote to reject the Plan shall be deemed to have accepted the Plan.

### D. Non-consensual Confirmation

If any impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory amounts as set forth herein, the Debtor reserves the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

## VI. TREATMENT OF EXECUTORY CONTRACTS AND LEASES

### A. Assumption of Executory Contracts and Unexpired Leases

Pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any person, to the extent not previously rejected by order of the Bankruptcy Court, shall be deemed assumed by the Debtor as of the Effective Date except for any executory contract or unexpired lease that (a) has been assumed or rejected pursuant to an order of the

Bankruptcy Court entered prior to the Effective Date, (b) has been renegotiated and either assumed or rejected on renegotiated terms pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (c) is the subject of a motion to assume or reject that is pending before the Bankruptcy Court on the Effective Date, (d) is the subject of a motion to approve renegotiated terms and assumption or rejection on renegotiated terms that is pending before the Bankruptcy Court on the Effective Date, (e) was entered into after the Petition Date either in the ordinary course of business by the Debtor or pursuant to an order of the Bankruptcy Court; or (f) is specifically assumed, rejected, or treated otherwise in the Plan or the Confirmation Order. Entry of the Confirmation Order shall constitute the approval, pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases, or, as the case may be, the assumption of executory contracts as set forth in the Plan.

Anticipated Cure Claims, to be paid in full within sixty (60) days of the Effective Date, are as follows:[8]

| Cure Claimant | Cure Amount | Nature of Agreement |
|---|---|---|
| Arthur J. Gallagher | $25,401.71 | Insurance |
| AT&T | $818.62 | Telephone service |
| BuyEfficient | $550.41 | Operating supplies |
| Choate USA | $3,205.09 | Exterior landscape maintenance |
| Cintas Corporation | $242.81 | Kitchen uniforms |
| Conference Call.com | $684.68 | Call service |
| CPS Energy | $18,628.08 | Utilities |
| Culligan Water Conditioning | $779.29 | Water treatment |
| Custom Business Solutions, Inc. | $227.33 | Training services |
| DirectTV | $140.35 | Television service |
| EcoLab | $1,220.64 | Food safety |
| Helium Express | $42.82 | Helium |
| HMC Beverage Company | $2,296.24 | Beverage services |

---

[8] The inclusion of the anticipated Cure Claims in this chart does not mean that such Claims are Allowed Claims, and the Debtor reserves all rights to object to any and all Cure Claims, whether or not listed in this Disclosure Statement.

| | | |
|---|---|---|
| HMC Hospitality Operating S&W-Mgt. Fees | $29,493.97 | Hotel management |
| Hospitality Staffing Solutions, LLC | $33,456.43 | Labor services |
| Lexyl Travel Technologies, LLC | $214.20 | Travel services |
| NuCO2 LLC | $839.59 | Carbonation |
| Orkin Commercial Services | $1,447.81 | Pest control |
| Otis Elevator Company | $2,289.57 | Elevator services |
| PCM Technologies | $342.00 | Music services |
| Pilgrim Cleaners | $389.35 | Dry cleaning |
| Plant Interscapes | $42.88 | Plant services |
| SAWS | $2,470.30 | Water |
| ScentAir Technologies, Inc. | $648.76 | Air supplies |
| SeaWorld | $156.20 | Park services |
| SLS Financial Services | $1,210.77 | Hotel van |
| Texas Imaging Systems | $181.35 | Imaging services |
| Tharldson Communications, Inc. | $182.00 | Telecommunication services |
| Time Warner Cable | $604.49 | Television services |
| Waste Management of Texas, Inc. | $150.77 | Waste disposal |
| **TOTAL** | **$128,358.71** | |

## B. Bar Date for Filing Cure Claims

Claims arising out of the assumption of an executory contract or unexpired lease pursuant to the Plan, and to the extent not scheduled and not the subject of a previously filed proof of claim, shall be filed with the Bankruptcy Court no later than thirty (30) days after the Confirmation Date. Any Claims not filed within such time will be forever barred from assertion against the Debtor, its Estate, its property, the

Reorganized Debtor or the Reorganized Debtor's property. The Debtor and Reorganized Debtor reserve all rights to object to such claims, and at the Debtor's or Reorganized Debtor's discretion, remove such executory contract or unexpired lease from the agreements to be assumed. Unless otherwise ordered by the Bankruptcy Court, all timely filed Claims arising from the rejection of executory contracts and unexpired leases shall be paid to the extent Allowed.

## VII. PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

### A. Method of Distributions Under the Plan

In General. All distributions under the Plan shall be made as set forth in the Plan by the Reorganized Debtor to the holders of each Allowed Claim at the address of such holder as listed on the Schedules, unless the Debtor has been notified in writing of a change of address including, without limitation, by the filing of a proof of claim by such holder that provides an address for such holder different from the address reflected on the Schedules for such holder.

1. Distributions of Cash. Any payment of Cash made by the Reorganized Debtor pursuant to the Plan shall be made by check drawn on a domestic bank.

2. Timing of Distributions. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Any payment or distribution required to be made under the Plan on any specific day shall be deemed timely if made no later than twenty (20) Business Days after such date.

3. Minimum Distributions. No payment of Cash less than $25.00 shall be made by the Reorganized Debtor to any holder of a Claim unless a request therefor is made in writing to the Reorganized Debtor or such payment constitutes the final distribution to the holder of a Claim under the Plan.

4. Unclaimed Distributions. Any distributions pursuant to the Plan, including cash, interest or other amounts earned thereon, that are unclaimed for a period of six (6) months after distribution thereof shall be reinvested in the Reorganized Debtor and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred. Failure to claim, cash or negotiate any distribution within six (6) months of such distribution shall relieve the Reorganized Debtor of the obligation to make any further distributions to the holder of the Claim to whom the distribution was made.

### B. Objections to and Resolution of Disputed Administrative Claims and Disputed Claims

After the Confirmation Date, the Reorganized Debtor shall have the exclusive right to make and file objections to Administrative Claims, other than applications for allowance of compensation and reimbursement of expenses for Professional Persons under §§ 330 and 503 of the Bankruptcy Code, and objections to Claims. All objections shall be litigated to Final Order; provided, however, that the Reorganized Debtor shall have the authority to compromise, settle, otherwise resolve or withdraw all objections, other than applications for allowance of compensation and reimbursement of expenses for Professional Persons under §§ 330 and 503 of the Bankruptcy Code, without approval of the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtor shall file and serve all objections to Administrative Claims (other than to applications for allowances of compensation and

reimbursement of expenses for Professional Persons) and objections to Claims upon the holder of the Administrative Claim or Claim as to which the objection is made no later than (a) ninety (90) days after the later of the Effective Date or the date on which a proof of claim or request for payment is filed with the Bankruptcy Court or (b) such other date as may be approved by the Bankruptcy Court.

## VIII.  <u>IMPLEMENTATION OF THE PLAN</u>

### A.      Implementing Actions

As a condition of the Effective Date, which shall be no later than sixty (60) days after the entry of the Confirmation Order, the following shall occur in implementation of the Plan:

1.      All actions, documents and agreements necessary to implement the Plan shall have been effected or executed;

2.      The Debtor shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are determined by the Debtor to be necessary to implement the Plan; and

3.      The New Equity Contribution shall be funded.

The Reorganized Debtor shall file a Notice of Effective Date with the Bankruptcy Court.

### B.      Funding of Plan

The primary sources of funds to carry out the Plan shall be the cash and operating receivables of the Reorganized Debtor, any recoveries from the SFG Adversary, and the New Equity Contribution. Other sources of funds would come from Causes of Action and any existing proceeds from the Causes of Action. As of the date of the filing of this Disclosure Statement, other than the SFG Adversary, the Debtor is unaware of any material Causes of Action. The funds from all these sources will be used:

1.      to pay in full all Allowed Administrative Expense Claims and Cure Claims;

2.      to establish a reserve fund, as necessary, to support distributions to all other classes of creditors by the terms described herein;

3.      to provide working capital for the Reorganized Debtor's operations as a reorganized entity; and

4.      to support the Reorganized Debtor's pursuit of its claims, defenses, and other rights in the SFG Adversary, and any other Causes of Action.

### C.      Vesting of Assets in the Reorganized Debtor

1.      Unless otherwise dealt with under the Plan, the property of the Debtor's Estate, which term shall include all property of the Estate under 11 U. S.C. § 541, shall vest in the Reorganized Debtor on the Effective Date (the "Vested Property").

2.      From and after the Effective Date, the Reorganized Debtor may operate the Reorganized Debtor pursuant to the terms of the Plan, and may use, acquire and dispose of property free of any restrictions imposed under the Bankruptcy Code.

3.      The Order confirming the Plan shall provide the Reorganized Debtor with express authority to convey, transfer and assign any and all Vested Property and to take all actions necessary to effectuate same.

4.      As of the Effective Date, all Vested Property shall be free and clear of all liens, claims and interests of holders of Claims and Equity Interests, except to the extent Vested Property is subject to the liens preserved by the Plan, or as otherwise provided in the Plan.

5.      From and after the Effective Date, the Reorganized Debtor shall remain constituted and in existence. The Reorganized Debtor shall be authorized, without any supervision or approval of the Bankruptcy Court or the Office of the United States Trustee, as the case may be, to employ and compensate such persons, including counsel and accountants, as each may deem necessary to enable it to perform its functions hereunder, and the fees and costs of such employment and other expenditures shall be paid from the Reorganized Debtor. Any fees and expenses of professionals incurred during the period between the Confirmation Date and the Effective Date shall remain subject to the jurisdiction of the Court and approved in accordance with the Plan.

6.      After the Effective Date, the affairs of the Reorganized Debtor and of all assets held or controlled by the Reorganized Debtor shall be managed under the direction of the Reorganized Debtor as provided by the terms of the Plan. In the performance of its duties hereunder, the Reorganized Debtor shall have the rights and powers of a debtor in possession under 11 U.S.C. § 1107, and such other rights, powers and duties incident to causing performance of the obligations under the Plan or otherwise as may be reasonably necessary, including, without limitation, the filing of any necessary tax returns.

**D.      Filing of Tax Returns and Delivery of Data as to Debtor**

The Reorganized Debtor shall be authorized to prepare, execute and file on behalf of the Debtor and the Reorganized Debtor, any necessary federal, state or local tax returns for any years for which no such tax returns have been filed, if any, and are due and pay any taxes due in connection with such returns. The Debtor does not believe any such tax returns are currently due and unfiled. The Reorganized Debtor shall use its reasonable judgment in determining which tax returns are necessary. The Reorganized Debtor shall file tax returns for the Reorganized Debtor. Any refunds due the Debtor and received by the Reorganized Debtor shall be utilized in the normal daily operations of the Reorganized Debtor and may be distributed under the Plan. As of the filing of this Disclosure Statement, the Debtor is current with its tax returns.

**E.      Costs and Expenses of the Reorganized Debtor**

The Reorganized Debtor shall bear and pay the costs and expenses incurred by the Reorganized Debtor and any professionals, agents or employees retained by the Reorganized Debtor, with respect to the Reorganized Debtor, including without limitation the costs and expenses of establishing, maintaining and administering the Reorganized Debtor, the costs and expenses of making distributions pursuant to the Plan, and the costs and expenses of creating and complying with tax return, tax information and other reporting

requirements. The Reorganized Debtor may employ on behalf of the Reorganized Debtor, without Bankruptcy Court order, professional persons, as such term is used in the Code, to assist the Reorganized Debtor to carry out the duties under the Plan.

## IX. <u>EFFECT OF CONFIRMATION</u>

### A. **Discharge of Debtor**

The rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of all Claims of any nature whatsoever against the Debtor and any of its property, including the Vested Property; and, except as otherwise provided in the Plan, upon the Effective Date, the Debtor shall be deemed discharged and released to the extent permitted by § 1141 of the Bankruptcy Code from any and all Claims, including but not limited to demands and liabilities that arose before the Effective Date, and all debts of the kind specified in § 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under § 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under § 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Plan. Except as provided in the Plan, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor. As provided in § 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtor at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Debtor, or its property, including the Vested Property, to the extent it relates to a Claim discharged.

### B. **Exculpation and Release of Debtor and Professionals**

The Plan contemplates that any and all Claims, liabilities, causes of action, rights, damages, costs and obligations held by any party against the Debtor and its respective attorneys, accountants, agents and other professionals, and their officers, directors and employees, whether known or unknown, matured or contingent, liquidated or unliquidated, existing, arising or accruing, whether or not yet due, prior to the Effective Date or in any manner related to the administration of the Case or the formulation, negotiation, prosecution or implementation of the Plan, shall be deemed fully waived, barred, released and discharged in all respects, except as to rights, obligations, duties, claims and responsibilities preserved, created or established by terms of the Plan.

### C. **Injunction Enjoining Holders of Claims Against the Debtor**

Except as expressly provided in the Plan, at all times on and after the Effective Date, all Persons who have been, are, or maybe holders of Claims against or Interests in the Debtor arising prior to the Effective Date, shall be enjoined from taking any of the following actions against or affecting the Debtor, its estate, or its property, including the Vested Property, with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan):

1.     Commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind against the Debtor, its Estate, or its property, including the Vested Property (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date which shall be deemed to be withdrawn or dismissed with prejudice);

2.      Enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree, or order against the Debtor, its Estate, or its property, including the Vested Property;

3.      Creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien against the Debtor, its Estate, or its property, including the Vested Property;

4.      Asserting any right of subrogation, or recoupment of any kind, directly or indirectly against any obligation due the Debtor, its Estate, or its property, including the Vested Property; and

5.      Proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan.

## X.   RETENTION OF EXCLUSIVE JURISDICTION BY THE BANKRUPTCY COURT

### A.      Exclusive Jurisdiction of Bankruptcy Court

The Bankruptcy Court shall have sole and exclusive jurisdiction over all matters arising out of, and related to, the Case and the Plan pursuant to, and for the purposes of, § 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1.      To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, if any are pending, and the allowance of Claims resulting therefrom;

2.      To determine any and all Causes of Action, adversary proceedings, including the SFG Adversary, applications and contested matters;

3.      To hear and determine any objection to Administrative Expense Claims or Claims;

4.      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

5.      To issue orders in aid of execution and consummation of the Plan, to the extent authorized by § 1142 and any other provisions of the Bankruptcy Code;

6.      To consider any amendments to or modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

7.      To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code and the Plan;

8.      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

9.      To recover all assets of the Debtor, the Estate, or the Reorganized Debtor, wherever located;

10.     To hear and determine matters concerning state, local and federal taxes in accordance with §§ 346, 505 and 1146 of the Bankruptcy Code;

11.     To hear and determine all issues arising with respect to the Reorganized Debtor under the Plan, including any issues relating to the Reorganized Debtor s duties and rights under the Plan;

12.     To hear and determine all matters concerning state, local and federal taxes in accordance with §§ 346, 505 and 1146 of the Bankruptcy Code;

13.     To hear any other matter not inconsistent with the Bankruptcy Code; and

14.     To enter a final decree closing the Case.

**B.      Condition Precedent to Effective Date**

The Effective Date is conditioned upon each of its definitional prerequisites under the Plan occurring, and the Confirmation Order becoming a Final Order, but shall occur no later than sixty (60) days after the Confirmation Date.

## XI.  CONFIRMATION PROCEDURE

The Bankruptcy Court will confirm the Plan only if it finds that all of the requirements of § 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the Plan: (i) is accepted by all impaired Classes of Claims and interests or, if rejected or deemed rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting Class; (ii) is feasible; and (iii) is in the "best interest" of Creditors and holders of Equity Interests impaired under the Plan.

**A.      Solicitation of Votes**

Any creditor of the Debtor whose Claim is impaired under the Plan is being solicited to vote, if either (i) its Claim has been scheduled by the Debtor and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) it has filed a Proof of Claim or Interest on or before the Bar Date set by the Bankruptcy Court for such filings. Any Claim as to which an objection has been filed, and such objection is still pending on the voting date, is not entitled to have its vote counted, unless the Bankruptcy Court temporarily allows the Claim upon motion by such creditor whose Claim has been objected to, in an amount which the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan. Such motion must be heard and determined by the Bankruptcy Court prior to the date and time established by the Bankruptcy Court to confirm the Plan. In addition, a creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**B.      Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan after the ballots have been cast. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjournment made at the Confirmation Hearing. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the

Plan has been accepted by the requisite majorities of each Voting Class; (ii) hear and determine all objections to the Plan and to confirmation of the Plan (iii) determine whether the Plan meets the requirements of the Bankruptcy Code and has been proposed in good faith; and (v) confirm or refuse to confirm the Plan.

## C. Acceptance

Each of the Voting Classes will be deemed to have accepted the Plan if the Plan is accepted by at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class (excluding certain Claims designated under § 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

## D. Fair and Equitable Test/Cramdown

The Bankruptcy Code establishes different "fair and equitable" tests for Secured and Unsecured Creditors as follows:

1. Secured Creditors. Either (i) each Secured Creditor in a non-accepting Impaired Class retains the liens securing its Secured Claim and receives on account of its Secured Claim deferred Cash payments having a present value equal to the amount of its Allowed Secured Claim, (ii) each Secured Creditor in a non- accepting impaired Class realizes the indubitable equivalent of its Allowed Secured Claim, or (iii) the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds of sale and the treatment of such liens on proceeds as provided in clauses (i) and (ii) of this subparagraph.

2. Unsecured Creditors. Either (i) each Unsecured Creditor in a non-accepting impaired Class receives or retains under the Plan property having a present value equal to the amount of its Allowed Claim, or (ii) the holders of Claims and Equity Interests that are junior to the Claims of the dissenting Class will not receive or retain any property under the Plan.

THE DEBTOR BELIEVES THAT THE PLAN DOES NOT DISCRIMINATE UNFAIRLY WITH RESPECT TO ANY CLASS, AND THAT IT IS FAIR AND EQUITABLE WITH RESPECT TO EACH IMPAIRED CLASS. THEREFORE, THE DEBTOR WILL SEEK CONFIRMATION OF THE PLAN EVEN IF LESS THAN THE REQUISITE NUMBER OF FAVORABLE VOTES ARE OBTAINED FROM ANY VOTING CLASS. THE DEBTOR RECOMMENDS THAT ALL CREDITORS AND EQUITY INTEREST HOLDERS VOTE TO ACCEPT THE PLAN.

## E. Feasibility

The Bankruptcy Code requires that in order to confirm the Plan the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test"), except as otherwise provided for under the Plan. In addition, the Bankruptcy Court must determine that the values of the distributions to be made under the Plan to each Class will equal or exceed the values which would be allocated to such Class in a liquidation under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test with respect to each impaired Class requires that each holder of a Claim or Equity Interest in such Class either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective

Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

The Debtor believes that the Plan meets the requirements of the Feasibility Test and of the Best Interest Test by providing cash distributions and security interests in accordance with the priority scheme set forth in the Bankruptcy Code. Due to the solid performance track record of the Debtor after opening its Hotel, the Reorganized Debtor is not expected to undergo liquidation or further financial reorganization.

## XII. <u>CAUSES OF ACTION</u>

The primary assets available for payment of claims under the Plan are the proceeds from the day to day operation of the Hotel, recoveries from the SFG Adversary, and the New Equity Contribution. Additional litigation assets may be available for distribution if such claims are litigated and result in recoveries. This Article of the Disclosure Statement provides a summary of potential claims and potential recoveries under the various Causes of Action.

On the Effective Date, all rights and Causes of Action, including claims asserted in the SFG Adversary and claims under §§ 502, 542, 544, 545, 546, 548, 550, and 553 of the Bankruptcy Code, preference claims under § 547 of the Bankruptcy Code, fraudulent transfer claims under § 548 of the Bankruptcy Code, and all other claims and causes of action of the Debtor's estate against any Person as of the Confirmation Date shall be preserved and transferred and assigned to the Reorganized Debtor. Such Causes of Action include, but are not limited to the Debtor's rights to avoid and recover transfers of an interest in property of the Debtor made by or on behalf of the Debtor in the ninety (90) days prior to the Petition Date (or in the case of insiders, in the one year prior to the Petition Date). Such transfers are indentified in the Debtor's Statement of Financial Affairs, as the response to Question 3.b. Attached hereto as **Exhibit D** is a copy of the Debtor's response to Statement of Financial Affairs Question 3.b. On the Effective Date, the Reorganized Debtor shall be authorized and shall have the power to bring any and all such Causes of Action. All recoveries, if any, received from or in respect of the Causes of Action (whether by settlement, judgment or otherwise) shall become and be property of the Reorganized Debtor to be distributed in accordance with the Plan. To the extent permitted under law, all rights under § 363(h) of the Bankruptcy Code are also preserved for the benefit of the Debtor's estate, and the Reorganized Debtor shall have the right to exercise those rights subject to Bankruptcy Court approval. The Reorganized Debtor may prosecute, settle or dismiss rights, claims, or causes of action as the Reorganized Debtor sees fit and all proceeds therefrom shall be the property of the Reorganized Debtor, except as expressly released within this Plan. The Debtor, its management, attorneys and other professional advisors shall have no liability to any entity or parties claiming through the Debtor for pursuing or not pursuing any such rights, claims, or causes of action vested in the Reorganized Debtor pursuant to the Plan.

## A. Preferences

Section 547 of the Bankruptcy Code allows a debtor to recover certain payments known as "voidable preferences." A "voidable preference" is a payment made within ninety (90) days prior to bankruptcy (or within one year of the bankruptcy for insiders) on an antecedent debt while the Debtor is insolvent which allows a creditor to recover more than it would have if the payment had not been made and the Debtor's assets were liquidated under Chapter 7. Certain payments are protected from recovery as

preferences. These include payments made in the ordinary course of business and upon ordinary business terms, and payments representing a substantially contemporaneous exchange. The Debtor made the payments identified in its Statement of Financial Affairs to certain creditors during the ninety (90) days for non-insiders and 365 days for insiders prior to bankruptcy. After the Confirmation Date, the Reorganized Debtor, in its sole discretion, will make decisions regarding pursuit of litigation to pursue recovery of such payments under 11 U.S.C. § 547. *See* **Exhibit D**.

## B.     Fraudulent Conveyances/Post-Petition Transfers

Provisions of the Bankruptcy Code allow a debtor to recover certain payments known as "fraudulent conveyances." A fraudulent conveyance is a transfer made within two (2) years of bankruptcy (or up to four years under state law) while the Debtor was insolvent, which either was made with fraudulent intent or was made without receiving reasonably equivalent value.

After the Confirmation Date, the Reorganized Debtor will make decisions regarding pursuit of these transfers under 11 U.S.C. § 548 and other applicable law.

Section 549 of the Bankruptcy Code allows a Debtor to recover post-petition transfers which were made without court approval. The Debtor is unaware of any unauthorized post-petition transfers.

## C.     Other Litigation

As of the date of the filing of this Disclosure Statement, the Debtor is not involved in any litigation, either as a plaintiff or as a defendant, except as plaintiff in the SFG Adversary, as disclosed herein.

## D.     Disclaimer

The Debtor has attempted to disclose all material Causes of Action, including avoidance and other actions under Chapter 5 of the Bankruptcy Code, that it may hold against third parties. However, the Debtor has not performed an exhaustive investigation or analysis of potential claims against third parties. Additionally, any and all of the herein described Causes of Action may have defenses, partial or total, to recovery by the Debtor and/or the Reorganized Debtor. Accordingly, the ultimate resolution of such claims may result in zero distributable assets being received by the Debtor and/or the Reorganized Debtor. It is the contemplation of the Plan that such investigation and analysis will occur post-confirmation by the Reorganized Debtor. The Debtor may hold other potential claims or causes of actions against third parties that the Debtor has not disclosed herein. You should not rely on the omission of the disclosure of a claim to assume that the Debtor holds no claim against any third party, including any creditor that may be reading this Disclosure Statement and/or casting a ballot. Unless expressly released by the Plan, any and all such claims against third parties are specifically reserved and transferred to the Reorganized Debtor. The Debtor's failure to identify a claim herein is specifically not a waiver of any claim or cause of action. The Debtor will not ask the Court to rule or make findings with respect to the existence of any cause of action or the value of the entirety of the Debtor's estate at the confirmation hearing; accordingly, except claims which are expressly released by the Plan, the Debtor's failure to identify a claim herein shall not give rise to any defense of judicial estoppel or res judicata with respect to claims which could be asserted against third parties, including creditors of the Debtor which may be reading this Disclosure Statement and/or casting a ballot. When casting your

ballot, you should consider and take into account the possibility that the Debtor may hold a claim against you that will be transferred to the Reorganized Debtor and, if the Reorganized Debtor deems advisable, fully pursued post-confirmation.

## XIII. <u>ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN</u>

If the Plan is not confirmed and consummated, the alternatives include: (i) preparation and presentation of an alternative plan of liquidation; or (ii) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

### A. **Alternative Plans of Liquidation**

The Debtor believes that failure to confirm the Plan will inevitably result in additional administrative expenses being incurred which will reduce and delay the likelihood of distributions to Creditors. The Debtor believes that the Plan, as described herein, fairly adjusts the rights of various Classes of Creditors consistent with the distribution scheme embodied in the Bankruptcy Code and enables Creditors to realize the most possible under the circumstances.

### B. **Liquidation Under Chapter 7**

One of the requirements to confirm a Chapter 11 plan is that creditors receive at least as much as they would under a Chapter 7 liquidation. In a Chapter 7 liquidation, a Trustee would be appointed to liquidate the Debtor's property and pay the claims of creditors. Property subject to liens would either be sold for enough to pay the liens or foreclosed upon by the creditor. Once the property was liquidated, the proceeds would go to any secured creditor, whose Claims were secured by liens upon the liquidated property, and Claims would be paid in the following order:

1. First, expenses of the Chapter 7 Trustee would be paid;

2. Second, expenses incurred during the Chapter 11 case and Allowed by the Court -- including the Chapter 11 Administrative Claims -- would be paid; and

3. Third, priority creditors Claims would be paid; and

4. Fourth, any remaining funds would be divided pro-rata among the unsecured creditors.

The Debtor believes that a liquidation under Chapter 7 would result in a reduced recovery of funds by the Debtor's Estate because of the additional administrative expenses involved in the appointment of a Chapter 7 trustee for the Debtor, and attorneys and other professionals to assist such a Chapter 7 Trustee, and the absence of the New Equity Contribution. Additionally, a Chapter 7 Trustee would lack the extensive personal knowledge held by the proposed Reorganized Debtor regarding the operation of the Hotel or the Causes of Action. Accordingly, the Debtor believes that if holders of Claims could or would receive anything in a Chapter 7 liquidation, such holders of Claims and Equity Interests may be expected to receive significantly smaller distributions pursuant to a Chapter 7 liquidation than the 100% distributions proposed under the Plan.

To determine what holders of Claims and Equity Interests in each impaired Class would receive if the Debtor was liquidated, the Bankruptcy Court must determine what funds could be generated from

the liquidation of the Debtor's assets and property in the context of a Chapter 7 liquidation case, which would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtor. Such asset amounts would be reduced by post-petition Chapter 11 administrative costs, and costs incurred by the Chapter 7 trustee and any professional retained by the Chapter 7 trustee. To determine if the Plan is in the best interest of each impaired Class, the present value of the distributions from the proceeds of the liquidation of the Debtor's assets and property (after subtracting the amounts attributable to the aforesaid Claims) are then compared with the present value offered to such Classes of Claims under the Plan.

In applying the Best Interest Test, the Claims in the Chapter 7 case would be classified according to the same seniority of such Claims as provided in the Plan, in the absence of a contrary determination by the Bankruptcy Court, all pre-Chapter 11 general unsecured creditor Claims that have the same rights upon liquidation would be treated as one Class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the Chapter 7 case of the Debtor. The distributions from the liquidation proceeds would be calculated ratably according to the amount of the aggregate Claims held by each Creditor. The Debtor believes that the most likely outcome of liquidation proceedings under Chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior Creditor may receive any distribution until all senior Creditors are paid in full with interest.

The Debtor's management has analyzed the Chapter 7 liquidation alternative to the Plan. Results of this analysis show clearly that liquidation of Debtor's remaining assets would result in most creditors, other than taxing authorities and secured creditors, receiving significantly less than the amounts to be distributed under the Plan.

The Debtor is led irrevocably to the conclusion that liquidation of its remaining assets in a Chapter 7 proceeding would not increase cash assets available for distribution and amounts would be inadequate to satisfy the total amount of Debtors Class 1, Class 1(a), Class 2, and Class 3, debt, and clearly would provide no funds or minimal funds for distribution to unsecured creditors.

Should the case be converted to a Chapter 7 liquidation, it is likely that S2 Acquisition would immediately seek to lift the automatic stay and foreclose its interests in the Hotel. With an scheduled value of $24,500,000, the Debtor anticipates S2 Acquisition would credit-bid 75% of this amount, or $18,375,000.00. S2 Acquisition will also likely satisfy tax claims secured by the property in the approximate amount of $426,196.41, in order to obtain the property free and clear. Using the figure of S2 Acquisition's asserted Claim, $20,500,000, plus the tax liability of $400,792.38, the net result would be a deficiency claim for S2 Acquisition of approximately $2,450,000.00. The Debtor's cash on hand varies daily, but is also subject to the asserted liens of S2 Acquisition. Using a cash-on-hand figure of $300,000, would reduce S2 Acquisition's claim to approximately $1,725,000.00. This figure for S2 Acquisition's deficiency claim must be added to the Scheduled amount of general unsecured Claims, $1,599,261.36. Without a source of cash, either for distributing or for the pursuit of the SFG Adversary or the Causes of Action, it is unlikely a chapter 7 trustee would have the resources to pursue the SFG Adversary or the Avoidance Actions. Even assuming every preference claim was pursued by a chapter 7 trustee, it is doubtful a chapter 7 trustee would receive in excess of the approximately $1,000,000 in potential preference claims identified in Exhibit D. Thus, it is unlikely the Debtor's Unsecured Creditors would receive 100% distributions to the Claims as offered under the Debtor's Plan.

# XIV.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

## A.    General

Under the Internal Revenue Code of 1986, as amended (the "Tax Code") and income tax regulations (the "Regulations") promulgated thereunder, there are certain potential federal income tax consequences associated with the Plan described in this Disclosure Statement. Certain of these consequences are discussed below.

This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as taxpayers who are not United States domestic corporations or citizens or residents of the United States, S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers, nonprofit entities or foundations, small business investment companies, persons that hold Claims Or Equity Interests as part of a straddle or conversion transaction and tax- exempt organizations).

No administrative rulings will be sought from the Internal Revenue Service ("IRS") with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be accepted by the IRS. No opinion of counsel has either been sought or obtained with respect to the federal income tax aspects of the Plan.

THE DISCUSSION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR GENERAL INFORMATION ONLY. ALL CREDITORS AND EQUITY INTEREST HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN, INCLUDING STATE AND LOCAL TAX CONSEQUENCES.

## B.    Tax Consequences to Debtor

General. The transfer of the assets of the Debtor to the Reorganized Debtor in satisfaction of the Classes of creditors may result in the recognition of gains and/or losses to the Debtor equal to the difference between the fair market value of the assets and the Debtor's tax basis in the assets.

The character of gains and/or losses that may be recognized by the Debtor as capital or ordinary gains or losses and, in the case of capital gains or losses, as short term or long term, will depend on a number of factors, including: (1) the nature of the assets; (2) whether the assets are capital assets in the hands of the Debtor; (3) whether any gain is required to be recaptured as ordinary income; and (4) whether the assets have been held for more than one year.

To the extent the Debtor satisfies claims at less than their face amount, the Debtor may realize debt discharge income.

However, to the extent that the Debtor realizes a discharge of debt pursuant to the Plan, the Debtor may not recognize income as a result of such discharge pursuant to the Internal Revenue Code. Even so, a taxpayer is required to reduce "tax attributes" by the amount of the debt discharged. Tax attributes

are reduced in the following order: (i) net operating losses; (ii) general business credits; (iii) capital loss carryovers; (iv) basis in assets; and (v) foreign tax credits.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

## C.  Tax Consequences to the Reorganized Debtor

Generally speaking, under the Internal Revenue Code of 1986 (the "Tax Code"), the filing of the Chapter 11 bankruptcy petition by Debtor results in the treatment of the estate as a separate taxable entity. The estate must file tax returns and pay taxes on its taxable income generated during the period of administration. Any tax liability payable by the estate would be an administrative claim. Accordingly, if the estate were to have a significant income tax liability, the funds available for distribution to unsecured creditors would be reduced.

The estate succeeds to the Debtor's tax attributes existing as of the first day of the taxable year in which the bankruptcy petition is filed. Accordingly, under the general rule, the estate would succeed to the Debtor's tax attributes existing as of January 1, 2011. These tax attributes could include any of the following: Debtor's net operating loss carryovers, investment tax credit carryovers, and tax bases in assets.

Until Debtor's tax returns for the pre-bankruptcy period are filed, the magnitude of the tax attributes available to the estate cannot be determined with certainty as of the time of this Disclosure Statement.

At least two courts have found that debtors continue to have liability for any taxes resulting from dispositions of assets under plans, although there can be no assurance that such rulings will necessarily be followed by the Court under the facts of this case. Taxes are potentially payable from dispositions of property by foreclosure, just as in the event of a voluntary sale. The amount of tax payable for sales of property encumbered by recourse debt would be measured by the fair market value of the property at the time of the sale, less the taxpayer's basis in the property. Further, disposition of property giving rise to losses and disposition of property giving rise to gains could occur in different tax years. Therefore, the Plan may create some risk of a tax liability to the bankruptcy estate (Debtor).

THE PRECEDING INFORMATION IS BASED ON THE 1986 TAX CODE AND THE DISCUSSION HEREIN MAY CHANGE BASED ON AMENDMENTS TO THAT TAX CODE. INDIVIDUAL CREDITORS SHOULD CONSULT THEIR OWN TAX ADVISERS REGARDING THE EFFECT OF THE PLAN. TO PROTECT BOTH THE DEBTOR AND THE ESTATE FROM TAX CONSEQUENCES, THE DEBTOR OR ANY PARTY IN INTEREST MAY, WITH COURT APPROVAL, RETAIN ACCOUNTANTS TO EVALUATE TAX ISSUES.

## D.  Tax Consequences to Creditors

1.     General.  The tax consequences of the implementation of the Plan to a Creditor will depend in part on whether the Creditor's present debt constitutes a "security" for federal income tax purposes, the type of consideration received by the Creditors in exchange for its Allowed Claim, whether the Creditor reports income on the accrual basis, whether the Creditor receives consideration in more than one tax year of the Creditor, whether the Creditor is a resident of the United States, and whether

all the consideration received by the Creditor is deemed to be received by that Creditor in an integrated transaction.

2. **Creditor Receiving Cash.** A Creditor who receives cash in full satisfaction of his Claim will be required to recognize gain or loss on the exchange. The Creditor will recognize gain or loss equal to the difference between the amount of cash received in respect of such claim and the Creditors tax basis in the claim.

3. **Character of Gain or Loss.** The character of gain or loss recognized by a holder of a Claim as capital or ordinary gain or loss and, in the case of capital gain or loss, as short term or long term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the holder of the Claim; (iii) whether the holder is a financial institution; (iv) whether the Claim is a capital asset in the hands of the holder; (v) whether the Claim has been held for more than one (1) year; and (vi) the extent to which the holder previously claimed a loss, bad debt deduction or charge to a reserve for bad debts with respect to the Claim. CLAIMANTS ARE URGED TO CONSULT THEIR INDIVIDUAL TAX ADVISORS REGARDING THESE ISSUES.

4. **Receipt of Interest.** Cash proceeds and other consideration received, or deemed received, by a Creditor which is attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether (1) the Creditor's existing Claims are capital assets in his hands and (2) the exchange is pursuant to a tax reorganization. A Creditor, who, under his accounting method, was not previously required to include in income, accrued but unpaid interest attributable to his existing Claims, and who exchanges his interest Claim for cash, other property or a combination thereof, pursuant to the Plan, will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that Creditor realizes an overall gain or loss as a result of the exchange of his existing Claims.

5. **Backup Withholding.** Under current tax law, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding." Withholding generally applies if the holder: (i) fails to furnish his social security number or other taxpayer identification number (hereinafter "TIN"), (ii) furnishes an incorrect TIN, (iii) fails to properly report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding.

## XV. **CONCLUSION**

This Disclosure Statement has attempted to provide information regarding the Debtor's estate and the potential benefits that might accrue to holders of Claims against and Interests in the Debtor under the Plan as proposed. The Plan is the result of the effort of the Debtor and its management to pay Allowed Claims against it. The Debtor believes that the Plan is feasible and will provide each holder of a Claim against the Debtor with an opportunity to receive greater benefits than those that would be received by termination of the Debtor's business and the liquidation of its assets, or by any alternative plan. The Debtor, therefore, hereby urges you to vote in favor of the Plan.

Dated: September 9, 2011.

Respectfully Submitted,

TAO-SAHI, L.P.

By: /s/ *Rashid Al-Hmoud*
In his capacity as Chief Financial Officer of
TAO Development Group, LLC, general
partner of TAO-SAHI, LP

JACKSON WALKER L.L.P.
100 Congress Avenue, Suite 1100
Austin, Texas 78701
(512) 236-2000
(512) 236-2002 - Fax
Email: msprouse@jw.com
Email: jskaggs@jw.com
Email: kgdula@jw.com

By: /s/*Marvin E. Sprouse III*
Marvin E. Sprouse III
State Bar No. 24008067
Jack Skaggs
State Bar No. 24051345
Kimberly Gdula
State Bar No. 24052209

**ATTORNEYS FOR DEBTOR**

6139862v.1 139293/00001